Filed 11/26/25  P. v. Guerrero CA2/5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>JOSEPH JOHN GUERRERO AND JONATHAN LUNA NAVARRO,<br><br>    Defendants and Appellants. | B337444<br><br>(Los Angeles County Super. Ct. Nos. VA154075 - 01/02) |

APPEAL from judgments of the Superior Court of Los Angeles County, Joseph R. Porras, Judge.  Affirmed.

Sunnie L. Daniels, under appointment by the Court of Appeal, for Defendant and Appellant Joseph John Guerrero.

Marilee Marshall, under appointment by the Court of Appeal, for Defendant and Appellant Jonathan Luna Navarro.

Rob Bonta, Attorney General, Charles C. Ragland, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior Assistant Attorney General, Scott A. Taryle, Supervising Deputy Attorney General, and Blythe J. Leszkay, Deputy Attorney General, for Plaintiff and Respondent.

* * * * * *

Defendants Joseph John Guerrero (Guerrero) and Jonathan Luna Navarro (Navarro) (collectively, defendants) appeal from judgments entered after their convictions for first degree murder arising out of a gang-related shooting in which Guerrero was the driver and Navarro, the shooter. On appeal, defendants argue that the trial court erred in admitting their jailhouse statements to undercover agents, in excluding evidence as to why Guerrero was harassed in custody, in admitting expert testimony about gangs, and in imposing a 50 year to life sentence on Navarro. We conclude there was no error and affirm.

## FACTS AND PROCEDURAL BACKGROUND

### I.     Facts

In August 2020, Guerrero and Navarro were members of the Whittier 13 street gang. On August 17, 2020, they drove into the territory of a rival gang, Southside Whittier. Guerrero drove his black BMW; Navarro was the passenger, and brought along his .40 caliber handgun. Although they initially were looking for members of the Pico Nuevo street gang, they drove past a man standing in front of a liquor store who flashed them a Southside

Whittier gang sign. Guerrero circled the block three times before stopping his car behind a taco truck, at which point Navarro opened the passenger door, put both of his feet on the ground, asked the man "Where are you from," and when he said "Southside," opened fire on him. Guerrero then sped off with Navarro. They wore medical-style masks and latex gloves, burned their clothes after the shooting, and Navarro sold the gun to an out-of-state buyer.

The evidence establishing Guerrero's and Navarro's guilt came chiefly from:

-- *Video.* Surveillance video captured the BMW pulling up as well as the shooter stepping out of the car and opening fire.

-- *Locational information from Guerrero's cell phone.* Locational data from Guerrero's cell phone company confirmed that the phone circled the block near the liquor store three times immediately before the shooting.

-- *Victim's identification of Guerrero's car.* Before the victim died, he identified the shooter as driving in a "Black BMW," which was the same car Guerrero drove.

-- *Guerrero's statements to undercover agents during a jailhouse conversation.* Immediately after his arrest, Guerrero was placed in a jail cell with two undercover agents who appeared to be gang members. Guerrero informed them that he was "Suspect" from "Whittier 13"; that he and Navarro had been on a "mission" "cruising" and "hunting" for "some fools from Pico Nuevo"; that they "passed by" a "southside Whittier" gang member in front of a "liquor store"; that the "fool" "thr[e]w up" a Southside gang sign; that Guerrero asked Navarro if he was "ready"; that Guerrero stopped his car so Navarro could "put his foot out" on the ground (because gang rules did not permit a

drive-by shooting); and that Navarro "just let [the Southside member] have it" by shooting him six times—"Boom"; and that they "put [the victim] in a body bag." When a police investigator thereafter entered the jail cell and handed Guerrero a fake flyer of a composite drawing of Guerrero, Navarro, and the victim, to stimulate more conversation, Guerrero thereafter identified himself and Navarro as the suspects, and the victim as "the fool [they] smoked."

-- *Navarro's statements to undercover agents during a jailhouse conversation.* Immediately after Navarro's arrest but after Guerrero had made his jailhouse statements, Navarro was placed in a jail cell with the same two undercover agents. Navarro initially indicated that he didn't "really like to speak" as to why he was in custody because he did not "know" the other men, but Navarro began to speak more openly once he realized that Guerrero had shared the details of their crime. Navarro then informed the agents that he and Guerrero were "over there handling . . . some business" looking for Pico Nuevo gang members; that they instead found a guy near a liquor store; that the guy was "slipping" (that is, being careless and unprepared for an attack); that they "double[d] back" on him; that Navarro "bang[ed] on him," and when he replied "Southside Whittier," Navarro said "we're from Whittier 13"; and that Navarro then "[l]et him have it" and emptied "[t]he whole clip," "boom, boom, boom."

## II.   Procedural Background

### A.   *Charges*

The People charged both defendants with first degree

4

murder (Pen. Code, § 187, subd. (a)).[1]  The People also alleged that a principal was armed with a firearm (§ 12022, subd. (a)(1)), and that Navarro personally used and intentionally discharged a firearm causing death (§ 12022.53, subd. (d)).[2]

### B. *Trial*

Guerrero and Navarro were tried together.

Guerrero testified in his own defense.  He admitted that he had driven his black BMW into Southside Whittier gang territory along with Navarro looking for members of the Pico Nuevo gang—with whom they had "beef"—not to hurt them, but to "talk to them," and further admitted that Navarro had shot the victim. However, Guerrero denied that he knew Navarro had a gun or that Navarro would shoot anyone; instead, Guerrero said that he had "go[ne] in circles" in order to "scare" the victim "but not [to] harm[] him or anything."  Guerrero initially said that he only slowed down when Navarro opened fire, but on cross-examination admitted that he "stopped [the car] in the perfect place for [Navarro] to shoot" "and kill" the victim.

The jury convicted both defendants of first degree murder and found the firearm enhancements true.

### C. *Sentencing*

The trial court sentenced Guerrero to prison for 26 years to

---

[1]      All further statutory references are to the Penal Code unless otherwise indicated.

[2]      The People also originally charged defendants with conspiracy to commit murder (§ 182, subd. (a)(1)), but later dismissed that count.  The People also charged but declined to proceed on other firearm allegations (§§ 12022.5, subd. (a), 12022.53, subds. (b) & (c)) against Navarro.

5

life, comprised of a base sentence of 25 years to life for first degree murder plus an additional one year for the principal use enhancement.

The trial court sentenced Navarro to prison for 50 years to life, comprised of a base sentence of 25 years to life for the first degree murder count plus a consecutive 25 years to life for the firearm enhancement.

### D. *Appeal*

Each defendant filed a timely notice of appeal.

## DISCUSSION

## I. Defendants' Statements to Undercover Agents

Guerrero and Navarro raise several challenges to the trial court's rulings admitting the incriminating statements they made to the undercover agents.

### A. *Voluntariness of statements*

#### 1. *Pertinent facts*

In the early portion of Guerrero's conversation with the undercover agents before Guerrero recounted the crime, the agents called Guerrero "little homie," gave him advice about how to get by in custody, urged him to "keep it straight" and not "lie," and assured him that they had his "back."

In the early portion of Navarro's conversation with the undercover agents before Navarro recounted the crime, Navarro introduced himself as "Boxer" from Whittier 13. Once Navarro indicated that he was a "Southsider" (that is, a Southern California gang member), the undercover agents told him that they "need to know" what he did because the "older cats" in custody would ask "what[] [Navarro's] deal" was, told Navarro that they had spoken to Guerrero and needed to verify whether Guerrero had been "bullshitting" them about the crime they

6

committed together, and offered to "school" Navarro on how to get by in custody. Navarro pushed back, demanding that the agents lift their shirts so he could see their gang tattoos for himself and telling the agents that he "don't really like to speak on it because [he didn't] know" them. When the agents started to share Guerrero's account of how he and Navarro had gone into Southside Whittier gang territory looking for "fools from Pico Nuevo" and that the cops had seized Guerrero's BMW, Navarro asked the agents, "He told you guys that?", and then opened up to them and recounted what had happened.

Prior to trial, Navarro moved to exclude the statements he made to the undercover agents, including on the ground that they were involuntary due to the age difference between Navarro (then, age 18) and the agents (then, both 48) as well as what Navarro characterized as implied threats of harm if Navarro did not tell the agents about the crime. Guerrero joined in this objection at a pre-trial hearing. The trial court "recognized the age difference and [defendants'] youth," but found that the interaction between the agents and Navarro "seemed pretty cordial," that the agents were neither "threatening" nor "overbearing," and that Navarro did not appear to be afraid or to make his statements solely to get protection from the agents while in custody. The court ruled that Navarro's statements were not involuntary and that Guerrero's were "even less" so.

During his testimony at trial, Guerrero testified that he felt "scared" and "intimidated" by the undercover agents.

2.  *Analysis*

The due process clauses of the federal and California Constitutions bar the admission of involuntary statements. (*People v. Winbush* (2017) 2 Cal.5th 402, 452 (*Winbush*); *People v.*

7

*Linton* (2013) 56 Cal.4th 1146, 1176 (*Linton*).) A statement is "involuntary" if the defendant's will is overborne by coercive police conduct. (*Winbush*, at p. 452; *People v. Carrington* (2009) 47 Cal.4th 145, 169.) In assessing whether a statement is involuntary, courts look to the totality of the circumstances, including factors relevant to the interrogation itself (that is, the interrogation tactics used, the length of the interrogation, its location, its continuity) as well as factors relevant to the defendant (that is, his maturity, education, physical condition, and mental health). (*People v. Massie* (1998) 19 Cal.4th 550, 576.) A statement may be involuntary if "'elicited by any promise of benefit'" (*People v. Holloway* (2004) 33 Cal.4th 96, 115) or threats of harm (*People v. McWhorter* (2009) 47 Cal.4th 318, 347). A court must examine the totality of the circumstances surrounding the admission. (*Linton,* at p. 1176; *People v. Guerra* (2006) 37 Cal.4th 1067, 1093.) We review the trial court's factual findings (including its credibility findings) for substantial evidence, but its ultimate determination of voluntariness de novo. (*Winbush*, at pp. 452-453.)

Navarro's statement to the undercover agents was voluntary. Although Navarro was 30 years younger than the two undercover agents, Navarro believed he was talking with fellow gang members, and spoke with them for only an hour. Navarro started out the conversation by announcing his gang affiliation and moniker, and interspersed his statements about the crime with jibes about favorite sports teams. (E.g., *People v. Jenkins* (2004) 122 Cal.App.4th 1160, 1173 [statement made when a defendant is "unaware" that he is talking to government agents and instead believes he is "talking to a friend" is less coercive].)

Guerrero's statement to the undercover agents was also

8

voluntary. He also started out by announcing his gang affiliation and moniker, and almost immediately started to discuss the details of the crime. Although Guerrero later testified that he was "afraid" of the agents, he did not thereafter renew his motion to exclude the statement and substantial evidence supports the trial court's finding that Guerrero's statement was voluntary and not the product of coercion.

Defendants resist this conclusion with two categories of arguments.

First, they argue that Navarro's statement was the product of "threats" by the undercover agents "that Navarro would suffer gang discipline if he did not share details of the shooting" with them. Although the agents implored Navarro to tell them what happened so they could inform the "older cats" in custody what Navarro's "deal" was and so they could assess whether Guerrero had been "bullshitting" them about the crime, Navarro was unmoved by any pressure that might have created; instead, he demanded that the agents lift up their shirts and openly refused to "speak on it" because he did not "know" the agents. What prompted Navarro to speak was his realization that *Guerrero* had already shared several details of the crime with the agents. This was a voluntary decision on Navarro's part. Defendants relatedly argue that the agents acted as "hardened gangsters" who held defendants' safety "if not their very lives, in their hands," but this argument is refuted by the recording, which indicates that the agents did not assert any particular stature with the gang and instead cast themselves as would-be protectors willing to "school" them on how to get by in custody.

Second, defendants argue that two cases—*Arizona v. Fulminante* (1991) 499 U.S. 279 (*Fulminante*) and *People v.*

9

*Haydel* (1974) 12 Cal.3d 190 (*Haydel*)—dictate a finding that Navarro's statement was involuntary. We disagree. In *Fulminante*, the Supreme Court held that a defendant's confession to a fellow inmate was involuntary because the inmate had told the defendant that he knew defendant was "'starting to get some tough treatment and whatnot'" from other inmates because the defendant had killed a child, and conditioned his willingness to protect defendant on defendant "tell[ing] him about" the crime. (*Fulminante*, at p. 283.) The Supreme Court concluded that the "fear of physical violence, absent protection from [the agent]" caused the defendant's will to be "overborne in such a way as to render his confession the product of coercion." (*Id.* at p. 288.) Unlike in *Fulminante*, there were no credible threats of violence leveled at Navarro, the agents did not promise any quid pro quo of protection for confession, and Navarro was an experienced gang member who bragged about avoiding incarceration and pushed back against the agents without hesitation (while Fulminante was of small build, had only a fourth grade education, and in previous incarcerations "felt threatened," was placed in protective custody, and admitted for psychiatric treatment (*id.* at p. 286, fn. 2)). In *Haydel*, the court held that a defendant's confession and consent to search his home made after hours of questioning and made only after he was told that his wife and infant child would be released from police custody only if he signed the consent form was "obtained in 'an atmosphere of substantial coercion,' created by the security officers," and it was thus "the product of psychological coercion and involuntary." (*Haydel*, at p. 201, citation omitted.) This case entails nothing similar to the psychological coercion used in *Haydel,* as defendants' family members were not detained or used

10

as leverage.

**B.** *Inadmissibility under the rules of evidence*

Navarro argues that the trial court erred in admitting Guerrero's statement to the undercover agents *against him* under the declaration against interest exception to the hearsay rule.[3]

### 1. *Pertinent facts*

Prior to trial, Navarro moved to exclude Guerrero's statement as evidence *against him*, partly on the ground that the portions of the statement implicating *Navarro* were not a declaration against *Guerrero's* penal interest. The trial court overruled this objection, finding that Guerrero's references to what "we"—that is, Guerrero *and Navarro*—had done together meant that those portions of Guerrero's statements explaining what Navarro had done also incriminated *Guerrero* and hence qualified as statements against Guerrero's penal interest.

### 2. *Analysis*

Navarro's statement to the undercover agents is hearsay because it is an out-of-court statement admitted for its truth. (Evid. Code, § 1200.) "To demonstrate that a [hearsay statement] is admissible as a declaration against interest [under section 1230], '[t]he proponent of such evidence must show [(1)] that the

---

[3] To the extent that Guerrero's argument that the admission of Navarro's statement to the undercover agents was prejudicial to Guerrero could be read as independently asserting that the trial court violated the Sixth Amendment's Confrontation Clause by admitting Navarro's statement against Guerrero, this argument lacks merit because the Confrontation Clause only applies to "testimonial hearsay" (*Crawford v. Washington* (2004) 541 U.S. 36, 53), and a statement unknowingly made to undercover agents is not "testimonial hearsay" (*People v. Arauz* (2012) 210 Cal.App.4th 1394, 1399-1402 (*Arauz*)).

11

declarant is unavailable, [(2)] that the declaration was against the declarant's penal interest when made[,] and [(3)] that the declaration was sufficiently reliable to warrant admission despite its hearsay character.'" (*People v. Grimes* (2016) 1 Cal.5th 698, 711 (*Grimes*), quoting *People v. Duarte* (2000) 24 Cal.4th 603, 610-611 (*Duarte*).)  Here, Guerrero was unavailable (the first element) because he had a constitutional right not to testify (Evid. Code, § 930), and statements made to undercover agents are typically found to be "sufficiently reliable" (the third element) because the declarant in that situation has no reason to embellish or shade his story (as he would if speaking with law enforcement officers) (e.g., *People v. Smith* (2017) 12 Cal.App.5th 766, 792 (*Smith*)).  "'In determining whether a statement is truly against interest [(the second element)] . . ., the court may take into account not just the words but the circumstances under which they were uttered, the possible motivation of the declarant, and the declarant's relationship to the defendant.'" (*Grimes*, at p. 711, quoting *People v. Frierson* (1991) 53 Cal.3d 730, 745.)  We review the admission of evidence for an abuse of discretion. (*Grimes*, at p. 711.)

The trial court did not abuse its discretion in concluding that *all* of Guerrero's statement, including those portions implicating Navarro, were against Guerrero's penal interest and sufficiently trustworthy (and hence admissible against Guerrero *and Navarro* as a statement against interest).  To be sure, courts may apply the declaration against interest exception only as to portions of an out-of-court statement that "specifically disserve[]" the declarant's penal interest. (*Duarte, supra*, 24 Cal.4th at p. 612.)  But portions of a statement that implicate others in a crime fit within the exception as long as they are "inextricably

12

intertwined with the declarant's admission of criminal liability." (*Grimes, supra*, 1 Cal.5th at p. 716.) Here, the portions of Guerrero's statements implicating Navarro specifically disserved Guerrero's penal interest and were inextricably intertwined with Guerrero's own admission of criminal liability. That is because Guerrero stated that he *and Navarro* were on a "mission" "hunting" for "fools" from Pico Nuevo, that *they* saw a "fool" from "Southside Whittier" throw up a gang sign; that Guerrero asked Navarro whether Navarro was "ready"; that Guerrero stopped the car so Navarro could get out and open fire; and that "we"— that is, Guerrero and Navarro—"put [the victim] in a body bag." By indicating that Guerrero knew of and intended to further a joint plan to kill their rival gang member, Guerrero's references to Navarro directly implicate Guerrero in that murder as an aider and abettor. Although Guerrero's role in the murder (as driver) was less than Navarro's (as shooter), Guerrero's statement accurately portrayed their roles and did not "shift the blame" in a way that rendered his statement untrustworthy. (See *Arauz, supra*, 210 Cal.App.4th at pp. 1400-1401 [driver's statement accurately recounting his role as driver as well as defendant's role as shooter admissible against both as a declaration against interest]; see generally, *Smith, supra*, 12 Cal.App.5th at p. 792 ["the fact [that] a hearsay statement portrays the declarant as a more minimal participant in a crime by itself does not require exclusion or end our analysis"].) And although Guerrero later portrayed himself as surprised by Navarro's action when Guerrero testified, that self-serving, subsequent statement did not negate the incriminating aspects of his statement to the undercover agents at the time that statement was made.

13

## C. *Inadmissibility under the Racial Justice Act*

Navarro next argues that the statements that he and Guerrero made to the undercover agents must be excluded because they were obtained in violation of the Racial Justice Act of 2020 (the Act) (§ 745). Specifically, Navarro argues that the Act was violated because (1) law enforcement placed Hispanic undercover agents in the jail cell when he and Guerrero are also Hispanic, and (2) he, Guerrero and the agents repeatedly used the "n" word. The Act generally prohibits "seek[ing] or obtain[ing] a criminal conviction . . . on the basis of race, ethnicity, or national origin" (§ 745, subd. (a)), and as pertinent here, more specifically prohibits "[t]he judge, an attorney in the case, a law enforcement officer involved in the case, an expert witness, or juror" from "exhibit[ing] bias or animus towards the defendant because of [his] race, ethnicity, or national origin" (*id.* at subd. (a)(1)) and prohibits the same individuals, "[d]uring the defendant's trial," from "us[ing] racially discriminatory language about the defendant's race, ethnicity, or national origin, or otherwise exhibit[ing] bias or animus towards the defendant because of the defendant's race, ethnicity, or national origin . . ." (*id.* at subd. (a)(2)). To the extent Navarro challenges the meaning of the Act, our review is de novo (*People v. Lashon* (2024) 98 Cal.App.5th 804, 810 (*Lashon*)); to the extent he challenges any factual findings made by the trial court, we review those findings for substantial evidence (*People v. Dunn* (2025) 18 Cal.5th 129, 154).

We reject Navarro's Act-based assertions for two reasons.

First, he has forfeited these claims because he at no time objected under the Act before the trial court, even though the Act had been in effect for over three years prior to his trial. This

14

constitutes a forfeiture. (See *Lashon, supra,* 98 Cal.App.5th at pp. 810-817; *People v. Singh* (2024) 103 Cal.App.5th 76, 112-116; *People v. Quintero* (2024) 107 Cal.App.5th 1060, 1077; *People v. Corbi* (2024) 106 Cal.App.5th 25, 41; *People v. Wagstaff* (2025) 111 Cal.App.5th 1207, 1219-1221.)

Second, Navarro's claims lack merit.[4] Navarro makes no effort to explain how the use of Hispanic undercover agents to pose as members of a Hispanic gang when speaking with defendants who are Hispanic gang members violates the Act or in any way exhibits bias or animus toward Navarro on the basis of his race or ethnicity. We also reject the argument that the use of the "n"-word by Navarro, Guerrero and the agents, as a familiar term between fellow gang members, violates the Act by exhibiting bias or animus toward Navarro or Guerrero on the basis of their race or ethnicity. The use of the term was not directed toward any African-Americans and was relevant to show the casual and non-threatening interaction between defendants and the undercover agents.

## II. Exclusion of Evidence As to Why Guerrero Was Placed in Protective Custody

Guerrero contends the trial court violated due process rights by excluding evidence that Navarro had Guerrero beaten as a snitch for telling the police he did not know, in advance, that Navarro was going to shoot the victim.

### A. *Pertinent facts*

As noted above, Guerrero told the undercover agents that he and Navarro had entered rival gang territory on a mission to

---

4 As a result, Navarro's related claim of ineffective assistance of counsel also necessarily fails. (See *People v. Ledesma* (2006) 39 Cal.4th 641, 748.)

find members of a particular rival gang and, when they could not find any such members, they saw and then issued gang challenges to a *different* rival gang member and, after Guerrero confirmed that Navarro was "ready," stopped the car so Navarro could shoot that rival gang member. Just hours after talking to the undercover agents, Guerrero told law enforcement officers that he had no idea Navarro had a weapon, denied that he stopped the car, and professed that he was totally surprised when Navarro had opened fire on the victim.

After Guerrero informed the trial court, mid-trial, that he planned to testify, he indicated his intent to testify that he had gotten beaten up while in custody, that he had been placed in protective custody at his own request, and that he believed that *Navarro* had engineered the beatings after viewing Guerrero as a "snitch." Guerrero argued that these facts "corroborat[ed]" his statement that Navarro had spontaneously shot the victim without Guerrero's advance knowledge. Navarro's counsel objected to testimony suggesting that *Navarro* had engaged in witness intimidation on grounds of Evidence Code section 352. Guerrero offered to "limit" the questioning to "is he in protective custody? Yes. And why? Because of assaultive conduct towards him, period." In part because the trial court did not want to "get into a whole new trial as to why [Guerrero] was attacked," the court implicitly sustained Navarro's section 352 objection and ultimately ruled that Guerrero could testify that he had asked to be placed in protective custody because he was concerned about his safety, but could not testify that Navarro was behind it.

Guerrero then took the stand. He testified that he was in protective custody because he was "concerned for [his] safety"

16

because he had been told he had "snitched." He also admitted that, while in jail, he got several more Whittier 13 gang tattoos.

**B.** *Analysis*

Evidence Code section 352 empowers a trial court to "exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (Evid. Code, § 352.) Evidentiary rulings that comply with the Evidence Code do not violate due process. (*People v. Hawthorne* (1992) 4 Cal.4th 43, 58; *People v. Lawley* (2002) 27 Cal.4th 102, 154-155; *People v. Jones* (2013) 57 Cal.4th 899, 957.) As noted above, we review a trial court's evidentiary rulings for an abuse of discretion.

Guerrero's unbidden offer to the trial court to limit the scope of testimony to the testimony actually elicited at trial constitutes a waiver. (Evid. Code, §§ 353 & 354; *People v. Peters* (1970) 7 Cal.App.3d 154, 159-160 [defendant who withdrew his motion under section 1538.5 and stipulated to the admissibility of the evidence could not raise the search and seizure issue on appeal].)

However, the trial court did not in any event abuse its discretion in excluding the evidence that Navarro was responsible for the beatings that Guerrero suffered in custody as a "snitch." To begin with, Guerrero did not proffer that he had any *evidence* that Navarro was behind the beatings; he only indicated his *belief* that it was so. This is speculative, and hence has little probative value. Even if we assume a stronger basis to suspect Navarro was the architect of the violence against Guerrero, whether Navarro was upset with Guerrero because

17

Guerrero had disclaimed any advance knowledge of Navarro's intent to shoot the victim does not tend to show that Guerrero lacked that advance knowledge.  Put differently, Navarro would have an incentive to engineer violence against Guerrero by virtue of Guerrero's admission that he saw Navarro pull the trigger—regardless of whether Guerrero had accepted or disclaimed responsibility for his role in that shooting.  Conversely, evidence that Navarro had engineered violence against Guerrero would be incredibly prejudicial to Navarro because it strongly resembles inadmissible propensity evidence—particularly when it rests on such a thin reed as Guerrero's uncorroborated speculation.  (Cf. *People v. Reeder* (1978) 82 Cal.App.3d 543, 552-553 [where evidence has a "probative value" that is "significant," due process may mandate its admission notwithstanding its prejudice to a co-defendant].)

Because there is no abuse of discretion, there is also no due process violation.

## III.   Admission of Gang Evidence

Navarro argues that the trial court erred in allowing the People to introduce gang evidence, although he does not specifically describe which gang evidence is allegedly problematic.  As noted above, we review a trial court's evidentiary rulings for an abuse of discretion.

### A.   *Pertinent facts*

Sheriff's Detectives Kyle Gillespie and Theodor Baljet, respectively, testified that the Whittier 13 and Southside Whittier gangs were rivals with adjacent territories, and that the location of the shooting was within the Southside Whittier gang's territory.  The detectives also testified that Hispanic gang members from southern California were known as Southsiders

18

and were part of the Mexican Mafia in the jail and prison system, that young gang members in custody had to follow Southsiders' rules as inmates or risk injury or death, and that Southsider rules forbade gang members from shooting out of a moving vehicle and from falsely taking credit for a crime they did not commit.  Detective Gillespie also explained that the phrase "banging on" means asking a person their gang affiliation and possibly displaying gang signs, and "putting in work" meant to commit crimes for the gang.

In response to Navarro's general objection to gang evidence where no gang enhancement had been alleged by the People, the trial court ruled that the proffered gang evidence was admissible to show the motive for the crime as well as define certain terms that jurors would not otherwise understand.  The court subsequently instructed the jury that the gang evidence was admissible "for the limited purpose of deciding whether[] [t]he defendants had a motive to commit the crimes charged" and "for [no] other purpose."

**B.**   *Analysis*

The trial court did not abuse its discretion in admitting the gang evidence in this case.  Gang evidence is admissible in a "gang-related case" "if relevant to motive or identity, so long as its probative value is not outweighed by its prejudicial effect." (*People v. Williams* (1997) 16 Cal.4th 153, 193.)  Further, evidence regarding the use of slang by gang members is admissible.  (E.g., *People v. Champion* (1995) 9 Cal.4th 879, 924-925.)  Here, both Guerrero and Navarro told the undercover agents that the victim was shot because of his affiliation with a rival gang, and those conversations employed the slang defined by the gang expert.  Because the gang expert's testimony had

19

substantial probative value, and because the court gave a limiting instruction that mitigated any unfair prejudice, the court did not abuse its discretion in admitting this evidence.[5]

Navarro's chief argument in response is that the newly enacted section 1109, which requires gang allegations to be bifurcated (see Assem. Bill No. 333 (2021-2022 Reg. Sess.), Stats. 2021, ch. 699, § 2, subds. (d)(6), (e), (f)), precluded the admission of the evidence in this case. He is wrong. First, Navarro has forfeited this claimed error because he failed to object on this ground in the trial court. (Evid. Code, § 353.) Second, the claim of error is meritless because our Supreme Court has held that gang evidence is still relevant in the guilt phase of a trial when relevant to the crime itself, as it was here. (*People v. Tran* (2022) 13 Cal.5th 1169, 1208 ["gang evidence, even if not admitted to prove a gang enhancement, may still be relevant and admissible to prove other facts related to a crime"].)

## V. Sentencing Issues

Navarro raises three challenges to his sentence.

### A. *Failure to order a post-verdict probation report*

Navarro contends the trial court erred in sentencing him without first ordering a post-verdict probation report (and erred by instead relying upon the pre-plea probation report). We reject this argument for three reasons. First, Navarro never asked the trial court to order a post-verdict report, so has forfeited the issue

---

[5] Indeed, Navarro does not argue the trial court erred in determining the evidence was relevant and admissible pursuant to Evidence Code section 352. We therefore accept that ruling as correct. (See *Tukes v. Richard* (2022) 81 Cal.App.5th 1, 12, fn. 5 ["A contention not appropriately raised in the opening brief under a separate argument heading may be deemed forfeited"].)

on appeal. (*In re Cheryl E.* (1984) 161 Cal.App.3d 587, 603 ["A party on appeal cannot successfully complain because the trial court failed to do something which it was not asked to do . . ."].) Second, he cites no authority that obligates a trial court to order a post-verdict probation report. Lastly, the absence of a post-verdict probation report was harmless in this case because (1) Navarro does not identify how a post-verdict probation report would have differed from the pre-plea report (beyond the content of the trial over which the trial court presided), and (2) Navarro is statutorily ineligible for probation in any event (*People v. Bullock* (1994) 26 Cal.App.4th 985, 987, 989 ["a report is not required for [probation-ineligible] defendants upon original sentencing"]; see also §§ 1203, subds. (e)(2)–(3), (g), 1203.06, subd. (a)(1)(A)).

B.  ***Refusal to dismiss the firearm enhancement under section 1385***

Navarro asserts the trial court erred by failing to dismiss or reduce the 25 year-to-life firearm enhancement. Specifically, he urges that the court should have dismissed or reduced that enhancement under section 1385 because (1) section 1385 provides than an enhancement that "could result in a sentence of over 20 years" "shall be dismissed" (§ 1385, subd. (c)(2)(C)), and (2) application of that enhancement "would result in a discriminatory racial impact" under the Racial Justice Act through disparate sentencing (*id*. at subd. (c)(2)(A)). Because the resolution of this question turns on issues of statutory interpretation and the application of the law to undisputed facts, our review is de novo. (*People v. Prunty* (2015) 62 Cal.4th 59, 71 [statutory interpretation]; *Boling v. Public Employment Relations Bd.* (2018) 5 Cal.5th 898, 912 [undisputed facts].)

Navarro's argument fails for multiple reasons. For starters, the trial court declined to dismiss the firearm enhancement (and declined to impose consecutive sentences) due to its "major concern" that defendant's conduct posed a risk to "public safety" insofar as Navarro's act in opening fire in front of a liquor store during business hours placed "a lot more people" at risk of being shot. Where, as here, a "[trial] court finds that dismissal of an enhancement 'would endanger public safety,'" then the court "need not consider" whether any of section 1385's mitigating circumstances exist. (*People v. Mendoza* (2023) 88 Cal.App.5th 287, 296.) Neither mitigating circumstance cited by Navarro exists here in any event. The application of the 25 year-to-life firearm enhancement would not "result in a sentence of over 20 years" because the 25 year-to-life base sentence for murder already exceeds 20 years. (*People v. Torres* (2025) 113 Cal.App.5th 88, 93-94.) What is more, the statutory language indicating that the enhancement "shall" be dismissed does not make dismissal mandatory. (E.g., *People v. Mazur* (2023) 97 Cal.App.5th 438, 444.) And the mitigating circumstance regarding racially disparate sentencing is inapt because Navarro offered no evidence of such a racial disparity.

C. ***Failure to consider Navarro's youth and lack of criminal history***

Navarro argues that the trial court failed to consider his youth and lack of criminal history. This argument fails because the trial court had information about Navarro's age and criminal history before it (and, indeed, referred to Navarro and Guerrero as "young men" at the time of sentencing). We presume that the trial court considered all relevant facts absence evidence to the contrary (*People v. Myers* (1999) 69 Cal.App.4th 305, 310 ["The

22

court is presumed to have considered all of the relevant factors in the absence of an affirmative record to the contrary"]), and no such evidence exists here.

## DISPOSITION

The judgments are affirmed.

<u>NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS</u>.


_____, P. J.

HOFFSTADT

We concur:


_____, J.

MOOR


_____, J.

KIM (D.)